# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **PAINTERS DISTRICT COUNCIL NO. 30 HEALTH & WELFARE FUND, on its own behalf and on behalf of all others similarly situated,** )<br>)<br>)<br>)<br>) | |
| **Plaintiff,** ) | **Case No.** |
| ) | |
| **vs.** ) | |
| **EVANSTON NORTHWESTERN HEALTHCARE CORPORATION,** )<br>)<br>) | |
| **Defendant.** ) | |

FILED: MAY 5, 2008
08 CV 2541    JH
JUDGE ANDERSEN
MAGISTRATE JUDGE DENLOW

**JURY DEMAND**

## CLASS ACTION COMPLAINT

Painters District Council No. 30 Health & Welfare Fund ("Plaintiff"), on behalf of itself and all others similarly situated, for its Complaint against Defendant, Evanston Northwestern Healthcare Corporation, complains and alleges as follows:

### NATURE OF THE CASE

1.      This lawsuit is brought as a class action on behalf of all end-payors who purchased inpatient and outpatient healthcare services directly from defendant Evanston Northwestern Healthcare Corporation ("ENH"), its wholly-owned hospitals, predecessors, or controlled subsidiaries and affiliates from at least as early as January 1, 2000 to the present (the "Class Period").

2.      During and throughout the Class Period, ENH engaged in illegal monopolization of the market for inpatient and outpatient healthcare services in the geographic triangle formed by ENH's three wholly-owned hospitals, Evanston Hospital, Glenbrook Hospital, and Highland Park

Hospital. As determined by the Federal Trade Commission, the merger of these hospitals substantially lessened competition in the relevant market.

3.     Because of ENH's unlawful conduct, Plaintiff and the Class (defined in ¶7 below) paid artificially inflated prices for healthcare services and, as a result, have suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

4.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 as the claims are authorized under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against the defendant for the injuries sustained by Plaintiff and Class by reason of the violations, as hereinafter alleged, of Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 7 of the Clayton Act, 15 U.S.C. § 18.

5.     This action is also instituted to secure injunctive relief against the defendant to prevent it from further violations of Section 2 of the Sherman Act and Section 7 of the Clayton Act as hereinafter alleged.

6.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7.     Venue is found in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d).

8.     Venue and personal jurisdiction is proper in this judicial district because during the Class Period ENH resided, transacted business, was found, or had agents in this District, and because a substantial part of the events giving rise to Plaintiff's claims occurred, and a

substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.

## DEFINITIONS

9.      As used herein, the term:

a.      "Healthcare services" refers to general inpatient and outpatient hospital services provided by ENH that are ordinarily provided by hospitals, including primary, secondary, and tertiary services.  These include, but are not limited to, obstetrical and pediatric services, psychiatric care, neurosurgery, radiation therapy, cardiology services, orthopedics, trauma centers, diagnostic centers, cancer treatments, internal medicine and general surgical services.

b.      "Person" means any individual, employee welfare benefit plan, partnership, corporation, association or other business or legal entity; and

c.      "Class Period" refers to the period from at least January 1, 2000 to the present.

## PARTIES

### A.  Plaintiff

10.     Painters District Council No. 30 Health & Welfare Fund is located in Aurora, Illinois and is an "employee welfare benefit plan" and an "employee benefit plan" within the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1002(1), 1002(3) and 1003(a).  As such, Plaintiff is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d).  Plaintiff is a not-for-profit trust, sponsored by and administered by a Board of Trustees, established and maintained to provide comprehensive health care benefits to participants-workers who are employed under various collective bargaining agreements and to their dependents.

- 3 -

11.     During the Class Period, Plaintiff and the Class purchased or paid for healthcare services directly from one or more of the hospitals owned by defendant ENH. As a result of ENH's unlawful monopolization, Plaintiff and the Class paid artificially inflated prices for healthcare services and were therefore injured in their business and property by reason of the antitrust violations alleged herein.

**B.     Defendant**

12.     Evanston Northwestern Healthcare Corporation ("ENH") is an Illinois corporation.  ENH provides healthcare services to the public through its wholly-owned hospitals, Evanston Hospital, Glenbrook Hospital and Highland Park Hospital.  Evanston Hospital is a 400-bed facility located in Evanston, Illinois.  Glenbrook Hospital is a 125-bed facility located in Glenview, Illinois.   Highland Park Hospital is located in Highland Park, Illinois and has approximately 150-200 beds.  ENH acquired Highland Park Hospital in 2000 in connection with its merger with Lakeland Health Services, Inc. ("Lakeland Health").  Until 2000, Highland Park Hospital was a wholly-owned subsidiary of Lakeland Health.

## GOVERNMENT PROCEEDINGS

13.     On February 10, 2004, the Federal Trade Commission ("FTC" or "Commission") issued a complaint alleging, *inter alia*, that the year 2000 merger of  ENH with Lakeland Health, which resulted in ENH's acquisition of Highland Park Hospital, violated Section 7 of the Clayton Act, 15 U.S.C. § 18.  Following an eight-week trial, the Administrative Law Judge issued an Initial Decision on October 17, 2005, concluding that the merger violated Section 7 of the Clayton Act and ordering divestiture.

14.     On August 6, 2007, the FTC affirmed the Administrative Law Judge's Initial Decision, with modifications, and ordered remedies to restore competition in the relevant market

in lieu of divestiture.  The FTC concluded that the evidence demonstrated "that the transaction enabled the merged firm to exercise market power and that the resulting anticompetitive effects were not offset by merger-specific efficiencies."  The Commission found that the record showed "that senior officials at Evanston [Northwestern] and Highland Park [Hospital] anticipated that the merger would give them greater leverage to raise prices, that the merged firm did in fact raise its prices immediately and substantially after completion of the transaction…."  The Commission also found that econometric analyses "strongly supported the conclusion that the merger gave the combined entity the ability to raise prices through the exercise of market power" and "established that there were substantial merger-coincident price increases and ruled out the most likely competitive benign explanations for substantial portions of those increases."

## CLASS ACTION ALLEGATIONS

15.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

16.     Plaintiff bring this action on behalf of themselves individually and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Class defined as:

> All persons or entities in the United States of America and Puerto Rico (excluding governmental entities, defendants, co-conspirators, other providers of healthcare services, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing) who purchased or paid for inpatient hospital services or hospital-based outpatient services directly from ENH, its wholly-owned hospitals, predecessors or controlled subsidiaries and affiliates (the "Class") from at least as early as January 1, 2000 to the present (the "Class Period").

17.     The Class is so numerous and geographically dispersed that joinder of all members in impracticable.  While Plaintiff does not know the number and identity of all members

of the Class, Plaintiff believes that there are hundreds of Class members the exact number and their identities can be obtained readily from Defendant's books and records.

18.     There are questions of law and fact common to the Class, which questions relate to the existence of the antitrust violations alleged, and the type and common pattern of injury sustained as a result thereof, including but not limited to:

      a.     Whether ENH has exercised monopoly power in the sale of healthcare services in the relevant geographic market.

      b.     Whether ENH's alleged conduct violates Section 2 of the Sherman Act;

      c.     Whether ENH's alleged conduct violates Section 7 of the Clayton Act;

      d.     Whether the conduct of ENH, as alleged in this Complaint, caused injury to the business and property of the Plaintiff and the other members of the Class;

      e.     The effect of ENH's exercise of monopoly power on the prices of healthcare services sold by ENH and its wholly-owned hospitals during the Class Period; and

      f.     The appropriate measure of damages sustained by Plaintiff and the other members of the Class.

19.     The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

20.     Plaintiff is a member of the Class, and its  claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff and the Class are direct purchasers of healthcare services and their interests are

coincident with and not antagonistic to those of the other members of the Class. In addition, Plaintiff has retained and is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

21.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

22.     Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

23.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist in the files of ENH and its wholly-owned hospitals. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action does not present any difficulties of management that would preclude its maintenance as a class action.

**RELEVANT MARKET**

24.     The relevant product market is the market for healthcare services, as defined herein.  The relevant geographic market is the geographic triangle created by the three hospitals wholly-owned by ENH, *i.e.*, Evanston Hospital, Glenbrook Hospital, and Highland Park Hospital.

## TRADE AND COMMERCE

25.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

26.    Because members of the Class are geographically dispersed, Defendant's activities were within the flow of, and substantially affects, interstate commerce.

27.    During the Class Period, ENH, through its wholly-owned hospitals, sold healthcare services to persons residing in Illinois and other states within the United States.

28.    ENH and its wholly-owned hospitals have used instrumentalities of interstate commerce to sell and market healthcare services.

29.    ENH and its wholly-owned hospitals have sold substantial healthcare services in a continuous and uninterrupted flow of interstate commerce to the Class  residing in states other than Illinois.  Payments for healthcare services by the Class also crossed state lines and are therefore part of interstate commerce.

## FACTUAL BACKGROUND

30.    Prior to January 1, 2000, ENH operated two hospitals within the relevant geographic market, Evanston Hospital and Glenbrook Hospital.  These hospitals competed in the relevant geographic market for healthcare services with Highland Park Hospital.

31.    On or about January 1, 2000, ENH merged with Lakeland Health Services, Inc., of which Highland Park Hospital was the sole subsidiary.  As a result of the merger, ENH acquired its competition in the relevant market.  As the record in the FTC proceeding revealed, senior officials at ENH and Highland Park Hospital anticipated that the merger would give them greater leverage to raise prices.

32.     Sometime after ENH's acquisition of Highland Park Hospital, and continuously through this date, prices for healthcare services at the three wholly-owned hospitals were substantially increased.  As the FTC determined, these price increases were directly the result of the merged firm's anticompetitive exercise of market power, not benign competitive reasons. Prices at the three ENH-owned hospitals continued at anticompetitive levels and remain so today.

33.     ENH began to implement its price increases sometime after the close of the merger. It achieved these price increases through a number of ways.  The FTC determined that"[ENH] rapidly increased the prices that it charged to most of its … customers to the higher of Evanston's or Highland Park's pre-merger rate for a particular service."  Moreover, "[ENH] then set about negotiating a single contract for all three of its hospitals with [customers].  [ENH] did not offer [customers] the option to enter into separate contracts for the hospitals, or to decline to use one or more of the three hospitals."  Finally, "[ENH] sought to raise its prices through the conversion of portions of some of its contracts from *per diem* to discount off charges payment structures."

34.     A month after the merger, ENH's President Neaman stated in a memorandum that "Some $24 million of revenue enhancements have been achieved … and '*none of this could have been achieved by either Evanston or Highland Park alone.* The 'fighting unit' of our three hospitals and 1600 physicians was instrumental in achieving these ends.' " (emphasis in original).

35.     Testimony of Highland Park Hospital officials during the FTC proceedings similarly confirmed that the merger enabled ENH to achieve price increases that would not have been possible but for the merger.  For example, the CEO of Highland Park Hospital prior to the merger contrasted post-merger price increases against Highland Park Hospital's pre-merger

negotiations with customers, testifying that before the merger he did not see an opportunity to raise prices.

36.    The econometric analyses performed by economists in the FTC proceeding further confirmed that the merger gave ENH market power to increase prices.  ENH's economist found that average net inpatient prices to the customers he examined increased by 9% or 10% more than the predicted level due to the merger.  The FTC's primary economist estimated that the merger caused market-wide average net price increases of 11% to 18%.

37.    The FTC also found that the inclusion of hospital-based outpatient services in the relevant product market would not have altered the outcome of the case before the FTC. Economists on both sides in the FTC proceeding found that "ENH's post merger price increases for inpatient services were not offset by reductions (or smaller increases) in ENH's prices for outpatient services."  In fact, ENH's economist found "…larger higher-than-predicted average merger-coincident net price increases for inpatient and hospital-based outpatient services combined (11% or 12%), than he did for inpatient services alone (9% or 10%)."

38.    On April 24, 2008, the FTC issued its Opinion of the Commission on Remedy and Final Order, copies of which are attached as Exhibit A and B respectively.

**VIOLATIONS ALLEGED**

**COUNT I**
**Sherman Act § 2 Unlawful Monopolization**

39.    Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs.

40.    By virtue of its acquisition of Highland Park Hospital on or about January 1, 2000, ENH acquired monopoly power in the marketing of healthcare services in the relevant geographic market and has abused and continues to abuse that power to maintain and enhance its

market dominance in the marketing and sale of Healthcare Services by unreasonably restraining trade, thus artificially and anti-competitively raising the price of Healthcare Services sold to Plaintiff and the Class.

41.     ENH's conduct constitutes unlawful monopolization and the unlawful use of anti-competitive conduct in the relevant market in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

42.     As a direct and proximate result of ENH's continuing violations of Section 2 of the Sherman Act, Plaintiff and the other members of the Class have suffered injury and damages in an amount to be proven at trial.

43.     Plaintiff and the Class seek money damages from ENH for its violation of Section 2 of the Sherman Act as well as injunctive relief.

44.     ENH's unlawful conduct has had the following impacts, among others:

a.     Prices charged by ENH and its wholly-owned hospitals to Plaintiff and the Class for Healthcare Services were maintained at artificially high and non-competitive levels; and

b.     Plaintiff and the other members of the Class have had to pay more for Healthcare Services than they would have paid in a competitive marketplace, unfettered by ENH's monopolization of the relevant market.

45.     During and throughout the Class Period, Plaintiff and the Class directly purchased Healthcare Services from ENH or its wholly-owned hospitals.

46.     Plaintiff and the Class paid more for the Healthcare Services that they purchased than they would have paid under conditions of free and open competition.

47.     As a direct and proximate result of ENH's conduct, Plaintiff and the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined.

## COUNT II
### Sherman Act § 2 Attempt to Monopolize
### (Plead in the Alternative to Count I)

48.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 – 40 and 42 of this Complaint.

49.     ENH acted with the specific intent to monopolize the market for healthcare services.

50.     There was and is a dangerous possibility that ENH will succeed in its attempt to monopolize the healthcare services market because ENH controls a large percentage of that market, and further success by ENH in excluding competitors from that market will confer a monopoly on ENH in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

51.     ENH's attempted monopolization of the healthcare services market has harmed competition in that market and has caused injury to the buyers and sellers in that market.  Prices in the healthcare services market have been higher than they would have been in a competitive market; the supply of services in that market has been lower than it would have been in a competitive market; and the number and effectiveness of competitors has been diminished by unlawful means.

52.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated ENH's attempted monopolization of the Healthcare Services market.

53.     Plaintiff and the Class have been damaged as the result of ENH's attempted monopolization of the Healthcare Services market.

## COUNT III
## Clayton Act §7 Violation

54.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

55.     As a result of the merger, ENH has been able to exercise market power in the relevant market. The merger of ENH and Highland Park created the largest hospital system in the relevant market. This market is highly concentrated and the combination significantly increased market concentration.

56.     It is unlikely that entry into the market would remedy, in a timely manner, the anticompetitive effects from the merger. Entry is difficult and likely to take more than two years because of the time required to plan for and to complete construction of an acute care hospital.

57.     Government regulations also make entry difficult. The Illinois Health Facilities Planning Act, 20 Illinois Code § 3960, restricts entry in this market. The Act prevents firms from entering the market by building a hospital without first obtaining a permit from the Illinois Health Facilities Planning Board ("Planning Board"), which administers the Act. The Planning Board has issued detailed regulations, 77 Illinois Administrative Code § 1100, governing the administration of the Act.

58.     For a prospective entrant, the prospects for receiving from the Planning Board a permit to build a new hospital are highly uncertain. The Illinois Health Facilities Planning Act, along with the regulations issued by the Planning Board, authorize the Planning Board to deny applications for permits based on various factors. These include, among others, the potential for

duplication of health care services; the desire for orderly development of health care facilities; and the background, character, and financial fitness of the applicant.

59.    Obtaining a permit to build a new hospital may take several years.  The Illinois Health Facilities Planning Act authorizes adversely affected companies to seek judicial review under Illinois Administrative Review Law of any final decision of the Planning Board. The regulations of the Planning Board define adversely affected persons to include the incumbent hospitals in the area. These hospitals have a right to intervene in the Planning Board proceedings and to seek judicial review. The time period from application at the Planning Board to completion of judicial review can take several years.

60.    The Illinois Health Facilities Planning Act also restricts expansion by current market participants. It requires a permit to expand capacity by more than 10 beds or more than 10 percent of current capacity, whichever is less.

61.    The effect of the merger substantially lessens competition in the provision of healthcare services in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C.§ 18, in the following ways:

>    a.    eliminating actual, direct, and substantial competition between ENH and Highland Park Hospital in the relevant product market and relevant geographic market for the provision of healthcare services;

>    b.    increasing the ability of the merged entity to unilaterally raise prices of healthcare services;

>    c.    reducing incentives to improve service or product quality in the relevant markets; and

      d.      eliminating Highland Park Hospital as a substantial and independent competitor in the relevant product market and geographic markets.

62.      The merger of ENH and Highland Park has substantially lessened competition in the relevant market, in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests:

A.      That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      That the Court adjudge that ENH has engaged in unlawful conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C.      That the Court adjudge that ENH has engaged in unlawful conduct in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

D.      That judgment be entered for Plaintiff and the other members of the Class against ENH for three times the amount of damages sustained by Plaintiff and the other members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

E.      That ENH, its wholly-owned hospitals, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner continuing or maintaining the unlawful exercise of monopoly power alleged herein and from adopting or following any practice, plan, program or device having a similar purpose or effect;

- 15 -

F. That the Court order the divestiture of Highland Park Hospital, and associated assets, in a manner that restores Highland Park Hospital as a viable, independent competitor in the relevant market;

G. That the Court grant any other relief appropriate to correct or remedy the anticompetitive effects of ENH's acquisition of Highland Park Hospital or to restore Highland Park Hospital as a viable, independent competitor in the relevant market; and

H. That Plaintiff and the other members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated: May 5, 2008     PAINTERS DISTRICT COUNCIL NO. 30
             HEALTH & WELFARE FUND


By:   */s/ Marvin A. Miller*
    Marvin A. Miller
    Matthew E. Van Tine
    Lori A. Fanning
    MILLER LAW LLC
    115 S. LaSalle Street
    Suite 2910
    Chicago, IL  60603
    Telephone:  312-332-3400

    Joseph Burns
    JACOBS, BURNS, ORLOVE,
    STANTON & HERNANDEZ
    122 South Michigan Avenue, Suite 1720
    Chicago, IL 60603
    Telephone:  (312) 372-1646


    ***Attorneys for Plaintiff***

## **JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demand a trial by jury of all of the claims

asserted in this Complaint so triable.

PAINTERS DISTRICT COUNCIL NO. 30
HEALTH & WELFARE FUND


By:  ___*/s/  Marvin A. Miller*_____
Marvin A. Miller
Matthew E. Van Tine
Lori A. Fanning
MILLER LAW LLC
115 S. LaSalle Street
Suite 2910
Chicago, IL  60603
Telephone:  (312) 332-3400

Joseph Burns
JACOBS, BURNS, ORLOVE, STANTON &
HERNANDEZ
122 South Michigan Avenue, Suite 1720
Chicago, IL 60603
Telephone:  (312) 372-1646

.

***Counsel for Plaintiff***

# EXHIBIT A

**In the Matter of Evanston Northwestern Healthcare Corporation**
**Docket No. 9315**

**OPINION OF THE COMMISSION ON REMEDY**

By ROSCH, Commissioner, For A Unanimous Commission:

## I. INTRODUCTION[1]

On August 6, 2007, the Commission ruled that the acquisition by Evanston Northwestern Healthcare Corporation ("ENH") of Highland Park Hospital ("Highland Park") in 2000 was anticompetitive and violated Section 7 of the Clayton Act. Although the Commission recognized that "[s]tructural remedies are preferred for Section 7 violations," it found that "this is the highly unusual case in which a conduct remedy, rather than divestiture, is more appropriate." Op. at 89. Specifically, the Commission determined that a more appropriate remedy here would be to require ENH to establish separate and independent negotiating teams – one for Evanston Hospital and Glenbrook Hospital (collectively referred to as "Evanston"), and another for Highland Park – to "allow MCOs [managed care organizations] to negotiate separately again for those competing hospitals, thus re-injecting competition between them for the business of MCOs." *Id.* at 90. The purpose of having separate and independent negotiating teams for Evanston and Highland Park is to replicate the competitive conditions that existed prior to ENH's 2000 acquisition of Highland Park as much as possible, short of divestiture. The accompanying Order should be read in that light. Prior to the acquisition, MCOs had the ability to negotiate separately with each hospital. Our Order restores that ability to MCOs, and is designed to ensure that MCOs and patients in the Chicago North Shore suburbs will not have to pay supracompetitive prices.

Because the Commission lacked sufficiently detailed information about the personnel involved in ENH's contract negotiations, or ENH's overall business operations, to craft a remedial order with precision, in our liability decision we asked Respondent to submit a detailed proposal for implementing the type of injunctive relief selected by the Commission. Respondent submitted a proposed final order on September 17, 2007; complaint counsel submitted their

---

[1]  This opinion uses the following abbreviations:

        CCFO - Complaint Counsel's Comments on Respondent's Proposed Final Order
        IDF - Numbered Findings of Fact in the ALJ's Initial Decision
        Op. - Commission's Liability Opinion
        RCAB - Respondent's Corrected Appeal Brief
        RFO - Respondent's Submission in Support of its Proposed Final Order
        RPTB - Respondent's Post-Trial Brief
        RRFO - Respondent's Corrected Response on Proposed Final Order
        TR - Transcript of Trial before the ALJ

comments on Respondent's proposal on October 29, 2007; and Respondent filed a reply on November 8, 2007.[2]

The principal issue in dispute between the parties at this juncture is whether the requirement that payors be allowed to negotiate separate managed care contracts for Highland Park and Evanston should apply only to inpatient services, as Respondent proposed, or instead whether, as complaint counsel argued, payors should be allowed to negotiate separately for the full range of hospital services – outpatient, as well as inpatient. The parties also disagreed on the definition of payors that will have the option to negotiate separate managed care contracts under the Order. Respondent wanted to exclude governmental payors, while complaint counsel proposed a broader definition of payors. In addition, we consider whether it would be better to make separate negotiations the default setting, to be employed unless payors opt out and instead elect to negotiate a single managed care contract for all ENH hospitals, rather than requiring payors to opt in to commence separate negotiations, which is what Respondent proposed. We also consider whether it is appropriate for the same negotiating teams who negotiate the separate managed care contracts also to be allowed to negotiate a single contract for all ENH hospitals when the payor opts to do so. Finally, there is disagreement between the parties over ENH's proposal for a dispute-settlement mechanism that the Commission requested in the event that the constituent hospitals and those negotiating with them cannot reach agreement when separate negotiations are elected.

We discuss our resolution of these issues, and other provisions of the Final Order we enter today, below.

## II. SEPARATE NEGOTIATIONS

### A. The Scope of the Order

In our Opinion on liability, we found that ENH's acquisition of Highland Park "eliminated the pre-merger price competition between Evanston and Highland Park, as well as the MCOs' option of contracting with one hospital but not the other."[3] We determined that, under the unique circumstances present in this particular case, this competitive harm would be best remedied by

---

[2] Respondent filed a corrected reply on November 9, 2007.

[3] Op. at 89. *See also id.* at 16 (after the acquisition ENH "set about negotiating a single contract for all three of its hospitals with each MCO" and "did not offer the MCOs the option to enter into separate contracts for the hospitals, or to decline to use one or more of the three hospitals").

imposing injunctive relief that "will allow MCOs to negotiate separately again for these competing hospitals, thus re-injecting competition between them for the business of MCOs." *Id.* at 90.

Respondent argued that it should be required to allow payors to negotiate separate managed care contracts with Highland Park only with regard to inpatient services, not outpatient services, because the relevant product market found by the Commission was acute inpatient hospital services. RFO at 2; RRFO at 2. Complaint counsel responded that limiting separate negotiations to inpatient services ignores the reality of competitive negotiations for hospital services, and deprives payors of the ability to weigh the benefits of contracting exclusively with one hospital on the basis of the total price for all hospital services. CCFO at 6-7.

Contrary to Respondent's argument, our findings regarding the relevant product market do not constrain us to fashion so narrow a remedy.[4] The principal purpose of relief in a Section 7 case is to restore competition that would have existed but for the illegal merger. *In re RSR Corp.*, 88 F.T.C. 800, 893 (1976), *aff'd*, *RSR Corp. v. FTC*, 602 F.2d 1317 (9th Cir. 1979). To this end, the Commission has broad discretion to impose relief that is "necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to the statute." *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 607 (1957). *See also Chicago Bridge & Iron Co. N.V. v. FTC*, 515 F.3d 447, 476 (5th Cir. 2008)("[A]ll doubts as to the remedy are to be resolved in the [Commission's] favor.")(quoting *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961)).

We agree with complaint counsel, and find that limiting separate negotiations to inpatient services would not effectively re-inject competition between Highland Park and Evanston for the business of MCOs because it does not comport with the reality of how payors contract for hospital services. It is clear from the record, and Respondent did not dispute (indeed, Respondent itself asserted), that MCOs typically do not contract separately for inpatient and outpatient services.[5] Rather, they negotiate and contract for the entire set of hospital services in one contract. TR 200 (Ballengee); [                              Redacted

---

[4] While Respondent asserted that we found that competitive harm occurred only with respect to inpatient services, RRFO at 2, in fact, we found that including hospital-based outpatient services in the relevant product market would not alter our findings of competitive harm. Op. at 57.

[5] *See* RPTB at 5 ("The undisputed evidence confirms that MCOs contract with hospitals for the entire bundle of inpatient and outpatient services that hospitals provide, often 'trading off' the price of inpatient and outpatient services against one another to get a deal done."); *id.* at 17 ("[i]t is undisputed that payors contract with hospitals for the entire bundle of inpatient . . . and outpatient services that hospitals provide . . . .").

3

] TR 2299-300 (Spaeth).  The evidence showing that payors make contracting decisions based on the price of the entire set of hospital services, sometimes trading off the price of inpatient services and outpatient services to get an acceptable total price, is not, as Respondent contended, inconsistent with our finding of a distinct inpatient services product market in which the competitive effects of this transaction can be assessed.  TR 2663-65 (Haas-Wilson).  It does, however, demonstrate that, for payors, the option to negotiate separately with Highland Park solely for inpatient services would be of dubious value.  Accordingly, we find that, in order to meaningfully and effectively restore competition between Highland Park and Evanston for the business of MCOs, payors must be able to negotiate separately with Highland Park for all hospital services, not just inpatient services.

Complaint counsel also pointed out that there may be certain services that, prior to the merger, were furnished at Highland Park and Evanston, that are now provided by ENH on a centralized basis to patients discharged from any of the hospitals in the ENH system.  The Order's definition of "Hospital Services," which includes all "services that are included as part of an admission of a patient to an inpatient bed" within the hospital and "all outpatient services that are related to the use of that hospital" is intended to make clear that if a payor elects to contract exclusively with one of the hospitals, it can obtain, through negotiations with that hospital's negotiating team, the full panoply of services needed to serve its plan enrollees, including any such services that are provided by ENH on a centralized basis.

The other question the parties have raised concerning the scope of our Order relates to the definition of a "payor" who must be allowed to negotiate separately with Highland Park and Evanston.  Complaint counsel proposed a definition that has been used in other health care orders issued by the Commission, including the 2005 consent order in this matter that settled the allegations of physician price fixing in Count III of the administrative complaint.[6]  Respondent argued that this definition should contain an exclusion for "government payors" because complaint counsel alleged, and the Commission found, harm only as to commercial MCOs and not to government payors such as Medicare and Medicaid.  RRFO at 2-3.

We agree with Respondent that government insurance programs such as Medicare and Medicaid should not be brought within the scope of the Order.[7]  We are concerned, however, that Respondent's proposed exclusion of all "government payors" is unduly broad.  There are governmental entities that, wholly apart from public health insurance programs such as Medicare

---

[6]  *See Evanston Northwestern Healthcare Corporation and ENH Medical Group, Inc.*, Docket No. 9315, Decision and Order (issued May 17, 2005), at 3, *available at* http://www.ftc.gov/os/adjpro/d9315/050520do.pdf.

[7]  Rates for Medicare and Medicaid are set unilaterally by the government, and are not determined by negotiation or contract.  IDF 128.

4

and Medicaid, contract and pay for health care services. For example, a municipality may procure and pay for health care coverage for its employees as a self-insured entity, much in the same way that some private employers do. To the extent that such a governmental entity may seek to contract for hospital services, we see no reason to exclude it from the scope of the Order. Accordingly, we have modified Respondent's proposed language to specify that the term "payor" excludes government payors for public health insurance programs, such as Medicare and Medicaid.

## B.    Separate Negotiations Should Be the Default Setting

Under Respondent's proposed order, it would have no obligation to commence separate negotiations for Highland Park and Evanston, unless a payor affirmatively asks to negotiate separately. Respondent thus envisioned that the default setting for managed care contract negotiations should be the *status quo* as it exists now, putting the onus on payors to re-introduce competition between Highland Park and Evanston for their business. We do not think the onus should be on payors to re-introduce the competition our Order here seeks to remedy. We think our remedy will be more effective if we make separate negotiations the default setting. Under this approach, ENH will be required to commence separate negotiations when contacted by a payor to negotiate a managed care contract, unless the payor (after notification by ENH of the Order) states its intent to contract jointly for both Highland Park and Evanston. For current contracts, Respondent shall promptly offer all payors the option of re-opening and re-negotiating them under the terms of the Order.

This remedy is designed to ensure that competition between Highland Park and Evanston for the business of MCOs is re-established as the norm, rather than treated by ENH (and, more to the point, by its personnel responsible for negotiating managed care contracts) as a departure from ENH's standard procedures for contract negotiations. This approach also will serve to minimize the risk that competitively sensitive information will be shared by the Evanston and Highland Park negotiating teams. Although the Order requires Respondent to put in place a firewall-type mechanism to prevent the sharing of such information, we think that such a firewall will be far more effective if separate negotiations are understood to be the baseline for managed care contract negotiations.

Of course, if a payor decides it is preferable to contract jointly for hospital services at both Highland Park and Evanston, it can communicate its intent to ENH and elect not to proceed with separate negotiations. But, by making separate negotiations the default setting, with payors able to opt out, we put the burden of restoring competition between Highland Park and Evanston squarely where it belongs – on ENH itself, not on the payors.

**C.      The Two Negotiating Teams Shall Remain Separate**

In our liability decision, we ordered Respondent to identify and describe a firewall-type mechanism that would prevent the Evanston and Highland Park negotiating teams (and other relevant personnel) from sharing any information that would inhibit them from competing with each other and with other hospitals.  We are not satisfied with the firewall mechanisms that Respondent has proposed.  Respondent defined the ENH negotiating team as the team responsible not just for the negotiations with Evanston when payors elect to negotiate for Evanston separate from Highland Park, but as the team also responsible for negotiating all services at all ENH hospitals when payors opt to negotiate for all three ENH hospitals together.  The ENH negotiating team thus wears two hats.  Respondent's firewall proposal did not discuss, much less explain, how the ENH negotiating team would be prevented from utilizing competitive information gained from its negotiations wearing one hat versus the other.  For example, there is nothing to prevent the ENH negotiating team from using competitive information gained from negotiating with payors on behalf of all three hospitals in a strategic manner when that same negotiating team conducts negotiations with payors who elect to negotiate separately with Evanston Hospital (as separate from Highland Park).

This result is inconsistent with the Commission's purpose in creating the separate and independent negotiating teams on behalf of Evanston and Highland Park, and it undermines our determination that separate negotiations be the default setting.  The teams are to be *separate and independent* so as to replicate as best possible, short of divestiture, the competitive conditions that would have existed without the merger of ENH and Highland Park.  The negotiating teams cannot be "separate and independent" if the ENH negotiating team also negotiates on behalf of all three hospitals.

Consequently, we think the firewall mechanism will be effective only if the Evanston and Highland Park negotiating teams are not permitted to engage in negotiations with payors who opt to negotiate jointly for hospital services at all three ENH hospitals.  Our Order in this respect defines the Evanston negotiating team as only negotiating contracts for the two Evanston hospitals, and not all three hospitals as Respondent proposes.  This is consistent with the purpose of the Order to ensure that competition between Highland Park and Evanston for the business of MCOs is re-established as the norm, rather than treated by ENH (and, more to the point, by its personnel responsible for negotiating managed care contracts) as a departure from ENH's standard procedures for contract negotiations.  This approach will minimize the risk that competitively sensitive information will be shared by the Evanston and Highland Park negotiating teams.

## III.  DISPUTE RESOLUTION MECHANISM

In its Notice Of Contemplated Relief accompanying issuance of the Complaint in this matter, the Commission made it clear that if it did not order divestiture to remedy any violation it found, it would consider all alternatives that might be reasonably necessary and appropriate to

restore competition lost because of the merger.  In its liability brief to the Commission, Respondent suggested the creation of separate negotiating teams as such a remedy.  RCAB at 91-91.  The Commission did not believe that remedy, standing alone, was sufficient.  It was concerned that separate negotiating teams working for the same corporate entity might have overarching knowledge unavailable to separate negotiating teams working for different corporate entities, and that, in any event, the former might not have the same incentives as the latter to bargain against each other as would occur in a competitive market.  For that reason, upon finding liability, the Commission issued an order asking Respondent and complaint counsel for their views respecting what measures might be reasonably necessary or appropriate, including a dispute resolution mechanism, to ensure compliance with the remedy proposed by Respondent.

Complaint counsel echoed the Commission's concern about the effectiveness of the separate negotiating team remedy standing alone, explaining that the separate negotiating teams would have no incentive to bargain against each other, since they would both ultimately be part of Respondent.  CCFO at 3, 11.  Complaint counsel also pointed out that a similar non-divestiture remedy, standing alone, did not work for the Department of Justice Antitrust Division in another context.  *Id.* at 3 n.4.  Respondent did not come to grips with complaint counsel's concerns in this regard.  It simply said it disagreed with those concerns.  RRFO at 1, n.1.

Notwithstanding that disagreement, Respondent recommended that disputes with payors be submitted to mediation, and then, if necessary, to binding arbitration; it drew an analogy to such arbitrations in many commercial contexts.  Respondent explained that "[t]he first step in any controversy would be mediation under the Commercial Mediation Rules of the American Arbitration Association ("AAA").  In the event that the conflict persists, binding arbitration under a mutually-agreed upon arbitrator who would be charged with determining an appropriate resolution.  These provisions are commonly-accepted methods of private dispute resolution in the commercial context and are, as a result, reasonable when applied in light of a disagreement between a Payor and the hospital(s)."  RFO at 5.

Complaint counsel expressed concern that there not be an inappropriate delegation of the Commission's authority over ENH's compliance with the Order.  CCFO at 9-10.  However, complaint counsel stated that they would have no objection to the inclusion of such dispute resolution procedures to resolve purely private contractual issues that might arise in the ordinary course in ENH's contracts with payors.  *Id.* at 9.

This background explains the reasons for the dispute resolution mechanism we adopt today.  We continue to believe that a dispute-settlement mechanism is reasonably necessary and appropriate to restore the competitive conditions that existed prior to the merger – *i.e.*, that the separate negotiating teams negotiate with payors in good faith, and that when the constituent hospitals and those negotiating with them cannot reach agreement, there be a means to resolve the impasse.  To this end, we adopt Respondent's suggestion that there be mediation, and then, if necessary, binding arbitration between ENH and payors as to disputes over the pricing and/or

other terms resulting from the separate negotiations required under the Order.[8]  We consider this reasonably necessary and appropriate to stimulate compliance with Respondent's suggestion that separate negotiations be implemented.  Lest there be any doubt about the Commission retaining jurisdiction over violations or possible violations of the Order, the Order provides that neither the mediator nor the arbitrator shall have any responsibility or authority to resolve issues concerning any violation or possible violation of the Order.

We require Respondent, at the option of the payor, to first try in good faith to settle the dispute by mediation in accordance with the Commercial Mediation Rules of the AAA.  If the dispute cannot be settled by mediation, then it must be settled by binding arbitration in accordance with the AAA's Commercial Arbitration Rules.  In order to best ensure that the arbitrator will be qualified to resolve such disputes, we order that the arbitration be held before a single arbitrator mutually agreed upon by Respondent and the payor.  Unless otherwise agreed between the parties to the arbitration, the manner of binding arbitration will be Final Offer Arbitration (sometimes referred to as "baseball style arbitration"), whereby each side must submit its best and final offer and the mutually agreed arbitrator shall then be obliged to pick what it believes is the best offer.  We consider Final Offer Arbitration to be attractive here because it has the "ability to induce two sides to reach their own agreement, lest they risk the possibility that a relatively extreme offer of the other side may be selected by the arbitrator."[9]  The standard to be used by the arbitrator in making its decision shall be what pricing/terms are fair and reasonable assuming competition between the hospitals as would exist but for the merger.  In order further to motivate the submission of fair and reasonable proposals, the loser shall pay the cost of the arbitration (excluding attorneys fees), unless the parties settle prior to final decision of the arbitrator or the method of arbitration adopted by mutual agreement is not Final Offer Arbitration.  In that event, if the parties do not agree how the costs shall be divided, the arbitrator shall decide.

The dispute resolution mechanism described above is reasonably related and ancillary to the primary remedial purpose of the separate negotiating teams required in the Order.  As previously described, Respondent itself suggested the remedy of separate negotiating teams to the Commission in its appeal brief as an effective means for the Commission to restore competition lost from the merger.  RCAB at 91-92.  Respondent itself also suggested mediation, and if necessary, binding arbitration, as its mechanism of choice for resolving disputes with payors, and explained that arbitration is common in many commercial contexts, as discussed above.  RFO at 5.  In sum, the binding arbitration provision we have ordered is aimed at overcoming the structural

---

[8]  The arbitration provision does not apply when a payor opts to negotiate jointly with all three hospitals.

[9]STEVEN J. BRAMS, NEGOTIATION GAMES: APPLYING GAME THEORY TO BARGAINING AND ARBITRATION 264 (2d ed. 2003).

difficulties of an order requiring separate negotiations by teams which are part of a single corporate entity, and is thus reasonably necessary to promote the effectiveness of the Order.

Separate negotiations without a binding arbitration provision are a non-starter in this case. Our only other choice absent inclusion of binding arbitration would be to order divestiture, and that is not our preference, given the unique circumstances described in our liability decision.

## IV.  THE FINAL ORDER

We turn now to the specific provisions of our Final Order.  Paragraph I defines the terms used in the Order.  Paragraph II requires ENH to negotiate managed care contracts for hospital services at Evanston (defined to include both Evanston and Glenbrook Hospitals) separately from managed care contracts for hospital services for Highland Park, and vice versa.  Paragraph II prohibits ENH from making a contract for Evanston contingent on entering into a contract for Highland Park, or vice-versa; it also prohibits ENH from making the availability of any price or term in a contract for Evanston contingent on agreeing to such prices or terms in a contract for Highland Park.  Paragraph II allows ENH to negotiate a managed care contract for Evanston and Highland Park together with a payor that specifically elects to negotiate and contract jointly for both hospitals rather than to negotiate separately.

Paragraph II also requires Respondent, at the request of the payor, to submit disputes as to prices and/or terms obtained by payor as a result of the separate negotiations, first, to mediation and, if that is not successful, to binding arbitration.  The terms of our Order require Respondent and a payor to first try to settle the dispute by mediation in accordance with the Commercial Mediation Rules of the AAA.  If the dispute cannot be settled by mediation, then it must be settled by arbitration in accordance with the AAA's Commercial Arbitration Rules before a single arbitrator mutually agreed upon by Respondent and the payor.  Unless the parties agree to an alternative manner of arbitration, the Order requires Final Offer Arbitration.  The costs, excluding attorney's fees, are to be borne by the loser, unless the parties settle prior to final decision of the arbitrator or the method of arbitration adopted by mutual agreement is not Final Offer Arbitration. In that event, if the parties do not agree how the costs shall be divided, the arbitrator shall decide. Neither the arbitrator nor the mediator shall have any responsibility or authority to resolve issues concerning any violation or possible violation of the Order.  The arbitration option of Paragraph II.D. does not apply to payors that choose to negotiate managed care contracts for all hospitals jointly.  Paragraph II.D. states that the arbitrator shall determine fair and reasonable prices and/or terms, assuming competition between the hospitals, as would exist but for the merger.

Paragraph III requires ENH to establish separate and independent negotiating teams for Evanston, on the one hand, and Highland Park, on the other, and to negotiate managed care contracts in competition with each other and other hospitals.  Paragraph III allows ENH to negotiate jointly for services at all three hospitals with payors who opt out of separate

9

negotiations, but the two teams used to negotiate for Evanston and Highland Park separately shall not be involved in the joint negotiations.

In order to ensure that these separate negotiating teams make independent contracting decisions, and to protect competitively sensitive contracting information, Paragraph IV of the Order requires ENH to maintain the confidentiality of that information and to establish and implement procedures and protections to accomplish that.  In order to preserve the efficiencies of ENH's integrated contract administration, ENH's Corporate Managed Care Department will be permitted to obtain managed care contracting information from both negotiating teams, but that department will be prohibited from making managed care contracting information obtained from one negotiating team available to the other negotiating team.

In addition, Paragraph V of the Order requires ENH to allow payors with pre-existing contracts to re-open those contracts and re-negotiate separate managed care contracts for Highland Park and Evanston.   This provision is needed so that ENH does not continue to benefit from its post-merger practice of denying payors the option of contracting with one hospital but not the other, which gave ENH the leverage to negotiate higher prices from payors.  *See* Op. at 15-16.

Paragraph X requires ENH to give prior notification to the Commission for any future acquisitions of hospitals that ENH may make within the Chicago Metropolitan Statistical Area for the next ten years.  The prior notification requirement is similar to those used in other hospital merger orders issued by the Commission.  Compliance with this requirement will provide to the Commission information about future acquisitions that would not be subject to the reporting and waiting obligations of the Hart-Scott-Rodino Act.

Paragraph XII specifies that the Order will terminate after twenty years.  Although Respondent urges us to terminate the Order after ten years, a 20-year sunset provision is consistent with the Commission's standard policy that core injunctive provisions of FTC administrative orders will ordinarily terminate after twenty years.[10]  We see no reason to depart from that policy here.  Respondent may, of course, seek to modify or set aside the Order, pursuant to Section 2.51 of the Commission's Rules of Practice,[11] at any time prior to the expiration of twenty years if the Order is no longer in the public interest.

Paragraphs VI and IX relate to ENH's requirement to notify affected persons of the existence of the Order.  Paragraph VII imposes reporting obligations on ENH similar to those in

---

[10]  *See* Policy Statement Regarding Duration of Competition and Consumer Protection Orders, 60 Fed. Reg. 42,569 (Aug. 16, 1995); Duration of Existing Competition and Consumer Protection Orders, 60 Fed. Reg. 58,514 (Nov. 28, 1995).

[11]  16 C.F.R. § 2.51.

other Commission merger orders to aid the Commission in monitoring ENH's compliance with its obligations. Finally, Paragraphs VIII and XI are standard obligations in Commission orders relating to ENH's compliance with the Order.

## IV. CONCLUSION

We acknowledge the criticisms of the remedy in this case, specifically that it does not require divestiture. We cannot stress enough, however, that the circumstances of this case are extraordinary. First, this is not a case in which the eggs were simply scrambled after the merger was consummated. That will almost never justify a remedy short of divestiture. Rather, this is a case in which a critical improvement was made to Highland Park after the merger was consummated (namely, the development and implementation of a cardiac surgery program). The record reflects that divestiture of Highland Park could have a substantial negative impact on Highland Park's cardiac surgery program. For example, Dr. Romano, complaint counsel's expert, testified that, standing alone, Highland Park might not have the volume that it needs to maintain the cardiac surgery program.[12] TR 3193 (Romano), *in camera*. Thus, if we were to order divestiture, and Highland Park were to lose the benefits of that program, Highland Park might not be an effective competitor, and competition might not be restored.

Second, and most important, this case involved a retrospective challenge that was made after the key improvement had already been made at Highland Park. We stress that divestiture will almost always be ordered when a merger is challenged, or faces the threat of a challenge, before the merger is consummated or before improvements are made at the acquired facility. As we indicated in our liability decision, in those circumstances, the acquiring party proceeds to close the transaction at its peril, and in taking any actions after consummation of the transaction, including making improvements to the acquired facility, it will be deemed to have assumed the risk that the acquired hospital or other facility will be ordered divested if liability is found. *See* Op. at 90-91. We emphasize that this was *not* the case for ENH's proposed acquisition of Highland Park. ENH did not "close its transaction at its peril," because at the time of its acquisition and the development of the cardiac program at Highland Park, there was no

---

[12] A delay in reestablishing Highland Park's cardiac surgery program also puts at risk Highland Park's interventional cardiology services, which involve procedures that may be scheduled in advance. To have an interventional program, it is necessary to have a backup cardiac surgery program in case complications occur. TR 5306-07 (Chassin).

investigation underway by the Commission.[13]  This is not to say if parties to a merger found to be illegal lack notice of a possible challenge, divestiture will not be ordered.  As we noted in our liability decision, divestiture is still almost always the appropriate remedy in such cases.[14]  Op. at 90-91.  But given the unique circumstances in this case we believe that a remedy short of divestiture is appropriate.

---

[13]  By contrast, in *Chicago Bridge & Iron Co. N.V. v. FTC*, 515 F.3d 447 (5th Cir. 2008), where the Commission did order divestiture of assets after the transaction had been consummated, the parties *were* on notice that they closed at their peril, because the Commission had opened an investigation before the transaction closed, and the parties closed the transaction in the face of that investigation.  *Chicago Bridge & Iron*, 515 F.3d at 455 (stating that "[p]rior to the acquisition, the Commission notified CB&I that it had significant antitrust concerns about the acquisition and was conducting an investigation.").

[14]  The Supreme Court has confirmed that divestiture, even if it imposes costs on the violator, is the preferred remedy.  *United States v. E.I. du Pont de Nemours & Co.,* 366 U.S. 316, 327 (1961).  This is true notwithstanding the enactment of the Hart-Scott-Rodino Act ("HSR Act").  The purpose of the HSR Act is to enable the antitrust enforcement agencies to block unlawful mergers before they occur, in recognition that this is preferable to ordering divestiture after the fact.  But the law is clear that the Commission has the authority to order divestiture in matters that are not challenged prior to consummation.  Clayton Act, Section 11(b), 15 U.S.C. § 45(b); *see also California v. American Stores Co.*, 495 U.S. 271, 284-85 n. 11 (1990).

# EXHIBIT B

**UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:**　　**William E. Kovacic, Chairman
Pamela Jones Harbour
Jon Leibowitz
J. Thomas Rosch**

————————————————————————
）
In the Matter of　　　　　　　　　　　　　）
）
**EVANSTON NORTHWESTERN HEALTHCARE**　）
**CORPORATION,**　　　　　　　　　　　　）　　　**Docket No. 9315**
　　　a corporation, and　　　　　　　　　）
）
**ENH MEDICAL GROUP, INC.,**　　　　　　　）
　　　a corporation.　　　　　　　　　　　）
————————————————————————）

**FINAL ORDER**

　　　This matter having been heard by the Commission upon the appeal of Respondent and the cross-appeal of complaint counsel; and the Commission having determined that the acquisition by Evanston Northwestern Healthcare Corporation ("ENH") of Highland Park Hospital ("Highland Park") in 2000 violated Section 7 of the Clayton Act, for the reasons stated in the Opinion of the Commission issued on August 6, 2007 ("Opinion"); and the Commission having affirmed the Initial Decision as to liability, but having vacated the proposed order issued as part of the Initial Decision, for the reasons stated in the Opinion; and the Commission having considered the submissions of Respondent and complaint counsel regarding a proposed final order; the Commission has now determined to issue a Final Order to remedy Respondent's violation of Section 7 of the Clayton Act.　Accordingly,

　　　It is ordered that the following order to cease and desist be, and hereby is, entered:

**I.**

　　　**IT IS ORDERED** that, as used in this Order, the following definitions apply:

　　　A.　　　"Commission" means Federal Trade Commission.

　　　B.　　　"Contract Administration" means the act or acts associated with compliance with and implementation of final contract terms, such as payment monitoring, communication of Payor medical and administrative policies, utilization management, liaison to the business office, annual updates, and organizing

managed care-related budget information.

C.    "Contract Management System" means a software application or other system that houses contract rates and is utilized for patient billing and modeling Pre-existing Contract rates and/or proposed rates.

D.    "Corporate Managed Care Department" means the department that will be responsible for Contract Administration for both Evanston and Highland Park.

E.    "ENH" or "Respondent" means Evanston Northwestern Hospital Corporation, its directors, officers, employees, agents, representatives, successors, and assigns; its joint ventures, subsidiaries, divisions, groups and affiliates controlled by Evanston Northwestern Hospital Corporation, and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

F.    "Evanston," means Evanston Hospital and Glenbrook Hospital, the hospitals owned by ENH and located at 2650 Ridge Avenue, Evanston, Illinois, and 2100 Pfingston Road, Glenview, Illinois, respectively.

G.    "Evanston Negotiating Team" means the team responsible for negotiating a Managed Care Contract for Hospital Services for Evanston when a Payor negotiates Managed Care Contracts for Hospital Services for Evanston separate from Hospital Services for Highland Park.

H.    "Final Offer Arbitration" means a manner of arbitration whereby each party in a disputed matter submits its best and final offer to an arbitrator who is then required to choose what he or she believes is the best offer (sometimes referred to as "baseball style arbitration").

I.    "Highland Park," means Highland Park Hospital, the hospital owned by ENH and located at 777 Park Avenue West, Highland Park, Illinois.

J.    "Highland Park Negotiating Team" means the team responsible for negotiating a Managed Care Contract for Hospital Services for Highland Park when a Payor negotiates Managed Care Contracts for Hospital Services for Highland Park separate from Hospital Services for Evanston.

K.    "Hospital" means any human medical care facility licensed as a hospital in the state in which the facility is located.

L.    "Hospital Services" means all inpatient hospital services, which include a broad cluster of medical, surgical, diagnostic, treatment, and all other services that are included as part of an admission of a patient to an inpatient bed within Evanston

2

or Highland Park, and all outpatient services that are related to the use of that Hospital.

M.     "Managed Care Contract" means a contract or agreement for Hospital Services between ENH and a Payor, including but not limited to rates, definitions, terms, conditions, policies, and pricing methodology (*e.g.*, per diem, discount rate, and case rate).

N.     "Managed Care Contracting Information" means information concerning Managed Care Contracts and negotiations with a specific Payor for Hospital Services; provided, however, that "Managed Care Contracting Information" shall not include: (i) information that is in the public domain or that falls in the public domain through no violation of this Order or breach of any confidentiality or non-disclosure agreement with respect to such information by Respondent; (ii) information that becomes known to ENH from a third party that has disclosed that information legitimately; (iii) information that is required by law to be publicly disclosed; or (iv) aggregate information concerning the financial condition of ENH.

O.     "Merger" means the 2000 merger of Evanston Northwestern Healthcare Corporation with Highland Park Hospital.

P.     "Operate" means to own, lease, manage or otherwise control or direct the operations of a Hospital, directly or indirectly.

Q.     "Ownership Interest" means any and all rights, present or contingent, of Respondent to hold any voting or nonvoting stock, share capital, equity or other interests or beneficial ownership in an entity.

R.     "Payor" means any Person that pays, or arranges for payment, for all or any part of any Hospital Services for itself or for any other Person.  Payor includes any Person that develops, leases, or sells access to networks of Hospitals.  The term does not include government payors for public health insurance programs, such as Medicare and Medicaid.

S.     "Person" means any individual, partnership, joint venture, firm, corporation, association, trust, unincorporated organization, joint venture, or other business or government entity, and any subsidiaries, divisions, groups or affiliates thereof.

T.     "Pre-existing Contract" means a Managed Care Contract between a Payor and ENH that is in effect on the date this Order becomes final.

3

## II.

**IT IS FURTHER ORDERED** that Respondent shall

A.    Negotiate Managed Care Contracts for Hospital Services for Highland Park separately and independently from Managed Care Contracts for Hospital Services for Evanston, and vice versa;

B.    Not make any Managed Care Contract for Hospital Services for Evanston contingent on entering into a Managed Care Contract for Hospital Services for Highland Park, or vice versa;

C.    Not make the availability of any price or term included in a Managed Care Contract for Hospital Services for Evanston contingent on entering into or agreeing to any particular price or term included in a Managed Care Contract for Hospital Services at Highland Park, or vice-versa; and

D.    At the request of the Payor, submit any disputes as to prices and/or terms arising out of the separate and independent negotiations required by Paragraphs II.A.- C. of this Order:

    1.    first to mediation under the Commercial Mediation Rules of the American Arbitration Association ("AAA"), and, if the dispute cannot be settled by mediation, at the request of the Payor to a single arbitrator, mutually agreed upon by ENH and the Payor, who shall conduct binding arbitration in accordance with the Commercial Arbitration Rules of the AAA at a location mutually agreed upon by ENH and the Payor, in order to determine fair and reasonable prices and/or terms assuming competition between the hospitals as would exist but for the Merger;

    2.    the arbitration shall be conducted as Final Offer Arbitration, unless ENH and the Payor agree to an alternative manner of arbitration;

    3.    costs of the arbitration (other than attorneys fees, which shall be borne by the party that incurs them) shall be borne by the loser if Final Offer Arbitration; if a manner other than Final Offer Arbitration or if the parties settle the matter prior to issuance of the final decision by the arbitrator, the arbitrator shall assess costs, unless the parties agree as to the allocation of costs;

4.      *provided, however*, that neither the mediator nor the arbitrator shall have any responsibility or authority to resolve issues concerning any violation or possible violation of this Order; the Commission retains jurisdiction over these issues.

*Provided further, however,* that nothing in this Paragraph shall prohibit Respondent from negotiating a Managed Care Contract with a particular Payor for Hospital Services for both Highland Park and Evanston jointly, if that Payor elects to negotiate jointly for all Hospitals rather than to negotiate separate Managed Care Contracts.

### III.

**IT IS FURTHER ORDERED** that

A.      No later than thirty (30) days after this Order becomes final, Respondent shall establish and thereafter maintain the Evanston Negotiating Team and the Highland Park Negotiating Team, which teams shall operate independent of each other and negotiate Managed Care Contracts separately and in competition with each other and other Hospitals.

B.      The Highland Park Negotiating Team shall be exclusively responsible for negotiating Managed Care Contracts for Hospital Services for Highland Park when separate contracts are negotiated pursuant to Paragraph II. of this Order.

C.      The Evanston Negotiating Team shall be exclusively responsible for negotiating Managed Care Contracts for Hospital Services for Evanston when separate contracts are negotiated pursuant to Paragraph II. of this Order.

D.      At the request of a specific Payor, ENH shall be permitted to negotiate a Managed Care Contract for Hospital Services jointly for both Evanston and Highland Park for that specific Payor for that specific Managed Care Contract; *provided, however*, that neither the Highland Park Negotiating Team nor the Evanston Negotiating Team shall be involved in the joint negotiations.

### IV.

**IT IS FURTHER ORDERED** that

A.      Respondent shall maintain Managed Care Contracting Information with respect to Evanston separate and confidential from Managed Care Contracting Information with respect to Highland Park.

B.    Managed Care Contracting Information with respect to Evanston shall not, directly or indirectly, be transmitted to or received by the Highland Park Negotiating Team, and Managed Care Contracting Information with respect to Highland Park shall not, directly or indirectly, be transmitted to or received by the Evanston Negotiating Team, except as otherwise provided in this Order.

C.    No later than thirty (30) days after this Order becomes final, Respondent shall implement procedures and protections to ensure that Managed Care Contracting Information for Evanston, on the one hand, and Highland Park, on the other, is maintained separate and confidential, including but not limited to:

    1.    establishing a firewall-type mechanism that prevents the Evanston Negotiating Team from requesting, receiving, sharing, or otherwise obtaining any Managed Care Contracting Information with respect to Highland Park, and prevents the Highland Park Negotiating Team from requesting, receiving, sharing, or otherwise obtaining any Managed Care Contracting Information with respect to Evanston;

    2.    establishing a Contract Management System for the Highland Park Negotiating Team that is separate or clearly-partitioned from the Contract Management System for the Evanston Negotiating Team to ensure the confidentiality of Managed Care Contracting Information; and

    3.    causing each of Respondent's employees with access to Managed Care Contracting Information to maintain the confidentiality required by the terms and conditions of this Order, including but not limited to:

        a.    requiring each employee to sign a statement that the individual will comply with these terms;

        b.    maintaining complete records of all such statements at Respondent's headquarters; and

        c.    providing an officer's certification to the Commission stating that such statements have been signed and are being complied with by all relevant employees.

D.    Nothing in this Order shall prevent the Highland Park Negotiating Team from requesting, receiving, sharing, using or otherwise obtaining Managed Care Contracting Information with respect to Hospital Services for Highland Park.

E.    Nothing in this Order shall prevent the Highland Park Negotiating Team from requesting, receiving, sharing, using or otherwise obtaining non-Managed Care

6

Contracting Information relating to any ENH Hospital or the entire ENH system, including, but not limited to, information related to costs, quality, patient mix, service utilization, experience data, budgets, capital needs, expenses, and overhead.

F.    Nothing in this Order shall prevent the Evanston Negotiating Team from requesting, receiving, sharing, using, or otherwise obtaining Managed Care Contracting Information with respect to Hospital Services for Evanston.

G.    Nothing in this Order shall prevent the Evanston Negotiating Team from requesting, receiving, sharing or otherwise obtaining non-Managed Care Contracting Information relating to any ENH Hospital or the entire ENH system, including, but not limited to, information related to costs, quality, patient mix, service utilization, experience data, budgets, capital needs, expenses, and overhead.

H.    If a Payor elects to negotiate and contract jointly for Hospital Services for both Highland Park and Evanston, nothing in this Order shall prohibit ENH from requesting or obtaining Managed Care Contracting Information with respect to Hospital Services for both Evanston and Highland Park for that particular Payor or from using that Managed Care Contracting Information for that particular Payor with respect to the joint negotiations and contracting for that particular Managed Care Contract.

I.    Nothing in this Order shall prevent the Corporate Managed Care Department from requesting Managed Care Contracting Information from the Evanston Negotiating Team or the Highland Park Negotiating Team, *provided, however*, that

1.    the Managed Care Contracting Information that is requested and obtained is used solely for the purpose of Contract Administration, and

2.    the Corporate Managed Care Department is prohibited from providing, sharing, or otherwise making available Managed Care Contracting Information:

a.    from the Highland Park Negotiating Team to or with the Evanston Negotiating Team; or

b.    from the Evanston Negotiating Team to or with the Highland Park Negotiating Team.

7

**V.**

**IT IS FURTHER ORDERED** that Respondent shall, solely at the option of the Payor and with no penalty to the Payor, allow Payors with Pre-existing Contracts the option to re-open and renegotiate their contracts under the terms of this Order:

A.    No later than thirty (30) days after this Order becomes final, Respondent shall notify all Payors with a Pre-existing Contract of their rights under this Order, and, for each such Pre-existing Contract, offer the opportunity to negotiate a separate Managed Care Contract for Hospital Services for Highland Park on the one hand and Evanston on the other hand.

B.    Respondent shall send notification of the above requirement and a copy of this Order to the Chief Executive Officer, the General Counsel, and the network manager of each such Payor by first class mail or e-mail, with return receipt requested, and keep a file of such receipts for three (3) years after the date on which this Order becomes final.

1.    Respondent shall maintain complete records of all such notifications at Respondent's headquarters, and

2.    Respondent shall provide an officer's certification to the Commission stating that such notification program has been implemented and that Respondent has complied with its provisions.

**VI.**

**IT IS FURTHER ORDERED** that, no later than ten (10) days after being contacted by a Payor to negotiate a Managed Care Contract, Respondent shall notify said Payor of its rights under this Order by sending a copy of this Order to the Chief Executive Officer, the General Counsel, and the network manager of the Payor by first class mail or e-mail, with return receipt requested. Respondent shall maintain complete records of all such notifications and return receipts at Respondent's headquarters and shall include in reports filed to the Commission an officer's certification to the Commission stating that such notification requirement has been implemented and is being complied with.

**VII.**

**IT IS FURTHER ORDERED** that Respondent shall,

A.    Within ten (10) days after this Order becomes final, and every sixty (60) days thereafter until submission of the first annual report required by Paragraph VII.B. of this Order, submit a verified written report to the Commission setting forth in detail

    1.    the manner and form in which it will comply with Paragraphs II. and III. of this Order, including but not limited to the composition, structure, and intended operation of the Evanston Negotiating Team and the Highland Park Negotiating Team, including but not limited to who will comprise the teams, where they will be located, who will supervise the teams, who will approve the Managed Care Contracts, what instructions the team members will receive, how the team members will be compensated, what other responsibilities the team members will have, and other details necessary for the Commission to evaluate Respondent's compliance with this Order; and

    2.    the manner and form in which Respondent will comply with Paragraph IV. of this Order.

B.    One (1) year from the date this Order becomes final, annually for the next nineteen (19) years on the anniversary date this Order becomes final, and at such other times as the Commission may require, submit a verified written report to the Commission setting forth in detail the manner and form in which it has complied and is complying with the Order.  In each such verified written report, include, among other things that are required from time to time, the following:

    1.    a full description of the efforts being made to comply with each Paragraph of the Order, including all internal memoranda and all reports and recommendations concerning compliance with the requirements of this Order;

    2.    notification of all requests for mediation and/or arbitration and a full description of the mediation and/or arbitration, including but not limited to identification of the arbitrator and the location of the arbitration, a full description of the status and results of mediation, a full description of the status of the arbitration and, if resolved, of the resolution of each arbitration; and

9

3.　　the identity of each member of the Evanston Negotiating Team, the Highland Park Negotiating Team, and the Corporate Managed Care Department.

C.　　Within sixty (60) days after the date this Order becomes final, and every sixty (60) days thereafter until Respondent has fully complied with paragraphs V and IX.A., and has obtained the signed statements of all of Respondent's employees described in Paragraph IV.C.3. and who are employed by the Respondent as of the date this Order becomes final, submit a verified written report to the Commission setting forth in detail the manner and form in which it has complied and is complying with the Order.

## VIII.

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order, and subject to any legally recognized privilege, and upon written request and five (5) days notice to the Respondent made to its headquarters address, Respondent shall, without restraint or interference, permit any duly authorized representative of the Commission:

A.　　Access, during business office hours of the Respondent and in the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda, calendars, and all other records and documents in its possession, or under its control, relating to any matter contained in this Order, which copying services shall be provided by Respondent at the request of the authorized representative(s) of the Commission and at the expense of the Respondent; and

B.　　To interview officers, directors, or employees of the Respondent, who may have counsel present, regarding such matters.

## IX.

**IT IS FURTHER ORDERED** that Respondent shall

A.　　Within thirty (30) days after the date this Order becomes final, send by first class mail, return receipt requested, a copy of this Order to each officer and director of ENH; and

B.　　Within ten (10) days of appointment of any new officer or director of ENH, send by first class mail, return receipt requested, a copy of this Order to such officer or director.

10

## X.

**IT IS FURTHER ORDERED** that, for a period commencing on the date this Order becomes final and continuing for ten (10) years, Respondent shall not, directly or indirectly, through subsidiaries or otherwise, without providing advance written notice to the Commission:

A.    Acquire any Ownership Interest in:

1.    a Hospital that is located within the Chicago Metropolitan Statistical Area; or

2.    any Person that Operates a Hospital that is located within the Chicago Metropolitan Statistical Area; or

B.    Enter into any agreement or other arrangement to Operate or otherwise obtain direct or indirect ownership, management, or control of a Hospital that is located within the Chicago Metropolitan Statistical Area, or any part thereof, including but not limited to a lease of or management contract for any such Hospital.

Said notification shall be given on the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the code of Federal Regulations as amended (hereinafter referred to as the "Notification"), and shall be prepared and transmitted in accordance with the requirements of that part, except that no filing fee will be required for any such Notification; Notification shall be filed with the Secretary of the Commission; Notification need not be made to the Department of Justice; and Notification is required only of the Respondent and not of any other party to the transaction. Respondent shall provide two (2) complete copies (with all attachments and exhibits) of the Notification to the Commission at least thirty (30) days prior to consummating any such transaction (hereafter referred to as the "first waiting period"). If, within the first waiting period, representatives of the Commission make a written request for additional information or documentary material (within the meaning of 16 C.F.R. § 802.20), Respondent shall not consummate the transaction until thirty (30) days after substantially complying with such request. Early termination of the waiting periods in this Paragraph may be requested by Respondent and, where appropriate, granted by a letter from the Commission's Bureau of Competition, *provided however*, that prior notification shall not be required by this Paragraph for a transaction for which notification is required to be made, and has been made, pursuant to Section 7A of the Clayton Act, 15 U.S.C. § 18a.

## XI.

**IT IS FURTHER ORDERED** that, Respondent shall notify the Commission at least thirty (30) days prior to (1) any proposed dissolution of Respondent; (2) any proposed acquisition, merger, or consolidation of Respondent; or (3) any other change in Respondent including, but not limited to, assignment or creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of this Order.

## XII.

**IT IS FURTHER ORDERED** that this Order shall terminate twenty (20) years from the date on which this Order becomes final.

By the Commission.


Donald S. Clark
Secretary


SEAL
ISSUED:  April 24, 2008